Online-3173 Michael Weston v. John Stafford In this case, there are cross-appeals. We'll proceed with first appellant and cross-appellant will respond to appellant's argument. We'll give the cross-appellant two opportunities to argue, the last being the very brief rebuttal to the issue raised on the cross-appeal of 137. There is also an individual You'll have to split your time if you want. We'll leave it at that. I think we've got two on each side. I moved as quickly as I could, but I could only get the one on the right. Thank you, Your Honor. I really appreciate this ability to speak before this court. My name is Michael Fox, and I represent two of the appellants in this case. And that would be Mr. Benson, Mr. Dolinar, and Mr. Stone, who are collectively known as Big Blue as a business. I also represent William Johnson, who was collectively known, or at least his trading corporation was William F. Johnson, incorporated, or he traded under the name of William F. Johnson. I think this case has been made unnecessarily complex. I think I have an idea. I don't know. I don't know. I've never placed a finger. You may want to start. Mr. Fox, it isn't often that we get a trial attorney actually appearing before us to argue as well. And you, of course, were the trial attorney, one of the trial attorneys. Well, okay, lower court, circuit court attorney. And, in fact, Judge Preston, I think, directed the question to you that he relied on, or the other side relies on, to argue that there is no fiduciary, in fact, issue here, because when Judge Preston asked you what is the evidence that there was that trust required to prove a fiduciary, in fact, relationship placed by the plaintiff in the defendant, according to their brief. According to their brief. According to their brief. You did not identify the evidence that you believe establishes a fiduciary, in fact. And so here we are on the oral argument, and I'm asking you, we'll. I will answer the question in the format in which I designed to address it. I don't agree that I didn't answer that question. I also don't agree that the trial court didn't cut me off at a point when I was in the midst of an answer of a question. We won't do that. There are two entities here that I represent. One is Mr. Johnson, and the other is Big Blue. They're slightly different factual issues. But Mr. Johnson addressing what the judge did with Mr. Johnson's situation makes it easier for us to conceptualize everything that occurred here. What happened is this. Mr. Johnson was an individual trader. He was a joint venture partner, an actual joint venture partner of John Stafford. When John Stafford approached him in the summer of 2000. You have 15 minutes. I'm going to move as fast as I can. I'm sorry if I'm seemingly taking too long. John Stafford asked him for the ability to negotiate the best price that he needed. A large bank with whom he was dealing to sell other entities. Asked him for permission to have the exclusive right to negotiate the best price for their joint business enterprise. That was the trust that was requested, and that was the trust that was given. Okay, wait a minute. Let me stop you right there. And that's one of the concerns I have. It's a fiduciary-in-fact relationship. Can that be created by virtue of one side simply putting all their trust in the other side and basically saying, you are my fiduciary-in-fact? Well, according to that's what you're arguing. You're arguing that they put all their trust in Mr. Stafford, and therefore Mr. Stafford becomes a fiduciary-in-fact. What I'm arguing is that he requested a specific trust to do a very important duty that he was the most qualified to do because of his relationship with the bank. And I'm also saying that in the case that I started, the Illinois Rockler case, it's precisely this type of situation. That's exactly what Mr. Lee, who was with Illinois Rockler, did with Mr. Tull. He just put one trust in him, and he asked him to fulfill that trust. And the only fulfillment of that trust was to negotiate the best price possible for their joint enterprise. But they were in a slightly different situation. But they were not. I'm sorry, Your Honor, and I apologize for interrupting. I assume that life's a little different in the circuit court, that it isn't quite transfers over to the appellate court. So you have to give us an opportunity to ask you questions, and then you can answer them. I thought between the ability to receive the questions and the time limit that I have. What happened in that case was what they said to define what created the fiduciary duty. And this is very important in Illinois Rockler. They said the question is raised as to whether a fiduciary relationship existed between Tull and Lee. While this court has from time to time set out factors and circumstances to be considered in ascertaining whether a fiduciary duty relationship exists, we have consistently refused to set out precise boundaries. But here's the important thing they said. Their decision to form and operate a corporation rather than a partnership does not change the fact that they were embarking on a joint enterprise and their mutual obligations were similar to those of partners. This was the same joint enterprise in which Mr. Johnson... I understand that's your position, Mr. Fox, and you have to help us out here. What is your precise position here? What is your argument? Are you saying that, in fact, the evidence here establishes a fiduciary effect, or are you saying that whether or not a fiduciary effect exists should be up to the prior effect because a fiduciary effect is not so clear that we can say as a matter of law that one does not exist? I'm absolutely saying the summary judgment was inappropriate. We introduced enough evidence from which a reasonable prior effect... You want to get before the jury. I wanted to get before the finder of fact, and I thought I had introduced more than enough evidence. This was not only something... What this decision seems to suggest, and forgive my trial demeanor, if you will... You don't have to forgive. What it means to suggest is that when you get in these relationships, because they say they can arise from social situations, they can even arise from friendships, but where there is a trust imposed and that gives one party dominance, that creates... Well, let's go to the dominance part because the dominance part is what Judge Preston said was lacking in this case, and let's start with dominance where all the parties, regardless of how they may have looked on Mr. Stafford, were equal. Wouldn't you say? I would absolutely not say. Okay. And this is why I would absolutely not say on page six of my brief. For the first time, we learned in our discovery that John Stafford, rather than negotiating with PD, made the following statement. I sold my business as a growing concern and sold it in its entirety with a deduction for payments that were going to be made to purchase the DPM. He did not disclose that to those people from whom he had elicited the trust. He did not disclose that he dominated this so much that he could name the price, and the lower he named it, the more he got... But dominance doesn't simply mean that this person is in control. Dominance means that the other person simply has no ability to respond to that dominance, and the question is, when I said equals, I didn't mean that both sides had equal information. I mean that whatever Mr. Stafford was doing, what he was doing because that's what he wanted to do, it was in his best interest, and the other side relinquished, gave up, said, Mr. Stafford, go ahead and do it. But that's exactly what these trusts do. They give to somebody who claims... They give them the position. When they said, you can negotiate... What does dominance mean? Dominance means that he had more power than they did. Where did that power arise from? Because he asked for it, and they gave it... And it was relinquished to him. Correct. Right. But were they... Before they gave up that power, were they in equal position? As to what? Well, were they both? In fact, Mr. Stafford was 30% and 70% and the other... No. And so they're certainly... Go ahead. The answer to that question is they were in equal positions insofar as their trading agreement was their joint venture partnership agreement. Remember, they were joint venture partners. I haven't forgotten that. And they were in equal position in that respect. They were not equally equal in the sense that there was, with respect to the agreement, a veto power that was held by Mr. Stafford. That is in one of the partnerships, but not in Mr. Johnson's. Okay. Well, let me suggest... Okay. Do you have any reason that Mr. Johnson has a stronger case here than the others? I'm saying the facts are slightly different, and I was going to use Mr. Johnson's to elucidate the other facts better, but I'm probably not succeeding in doing that with this court. Here's what I suggest. Well, don't jump to conclusions because you're being interrogated. Let me ask... Well, let me suggest this. We ask, you ask. You ask and I talk. Okay. What I'm suggesting to you is this, that when they were working together in their joint venture partnership and it was all fine, they were equal in terms of the agreement they had made. They were all lawyered up, weren't they? No, they were not all lawyered up. Johnson had no lawyer whatsoever in that case. He was not as lawyered up as the other parties. Well, I wasn't going to call him lawyered up, but he wasn't lawyered up at all. Did he sign that ultimate agreement where basically if you take the agreement and eliminate all parole evidence, they waived everything but the flag with respect to an issue that there was ever a fiduciary relationship involved? I don't know. It's just a written document. Yeah. Justice Kagan, I'm sure, is referring to Section 6.7 of the SBA. And he's saying that if you signed that, you would relinquish any claim that the person who had acted as your representative. It says the parties did not rely on any representations. That is correct. The parties didn't rely on it. John Stafford wasn't a party to that agreement. He was their representative in the negotiations. He was the man they relied on. You'd likely rely on a lawyer or you'd rely on any other fiduciary duty. They put him in that exclusive ability to talk to these people, to find out what their metric of value was. Okay. I understand. So that would take this out of the Terrapelli? Absolutely out of Terrapelli. This isn't even close to Terrapelli. Terrapelli addresses parties who are dealing at arm's length. We're addressing a party who got inside the skin of another party and said, I will be beneficial to you as somebody who can be advantaged for being inside your skin. I can get inside your skin. I can take your cause to TD, and I can negotiate the best price because I have the power, the knowledge, and the persuasion. There was another individually negotiated or an attempt to negotiate a sale of an individual portion of one of the partnerships. With regard to Big Blue, there was an offer that was made by a group called SLK, and John Stafford threatened to veto the deal with SLK. Stafford, I think ironically, argued that that somehow diminished his power, diminished his dominance in terms of his ability to deal with TD. Rather than diminish his dominance and his ability to TD, he made TD. By that time, as far as the frame of this transaction had moved along, he made himself a completely dominant party. Tell me a little bit about this disclosure requirement that was imposed on Stafford with respect to his economic benefit derived from the agreement that was held. Oh, the so-called warranty? Yes. Why do you say so-called? Well, the reason I say so-called is because there was a similar situation that was argued. You say it's a so-called warranty even though it says it's black and white. It is, in fact, a warranty. But not a warranty for the purpose of disclosing what we say was hidden. What it said was it was a warranty that you didn't receive. I allocated the amount. He didn't tell them that. He didn't disclose that. He didn't say I set the price. He didn't say that. What motivated them to ask that for him and from him in the first place? That was something he offered in return when they asked for the master purchase agreement. Okay. Because they hadn't gotten the master purchase agreement. Does this sound like somebody who's dealing with a fiduciary when they ask for all this information from Stafford? It sounds to me like a group of lawyers who really don't trust the other side. Well, first of all, you're looking once again back at Johnson who agreed to the price that Stafford negotiated I'm going to work my way there. Is it conceivable under your theory of this case that some plaintiffs could win and some plaintiffs could lose on this whole fiduciary affair? Well, I think there are different facts that could be argued with Big Blue, but I still think both of them are questions of fact that should be decided by prior fact. Just check it. Now, with respect to this information that was requested to Stafford, the warranty about his financial participation in this. It wasn't his financial participation. The benefit that he was to derive from it. The group, he worked through these artifices or mechanisms. Just let me finish. The moment you call it an artifice, you put a twist on it. I do put a value judgment on it. And their mechanism is okay. I'll go with mechanism then. But he used the mechanism. He said, just as in the Illinois Rockford case, he got an oral warranty. He did comply with your request. Stafford, at the end of the agreement, said, we warrant that. And he did that in writing, didn't he? Yes. Okay. That's correct. And what did he warrant? He warranted that he got no proportional difference other than the ownership. Have you proved otherwise? Yes. Oh, you have proved it already? I already have, sure. Are you waiting for an opportunity to do that? We employed experts and prepared an entire expert report on damages, suggesting that there was all kinds of money allocated that should have been allocated to these DPMs that was not allocated. How could you have possibly done that? No, no. When, in fact, you all agreed to a deferral on some of the compensation, right? It was in two parts. There was money being paid up for it. I'm talking about back-end and front-end. Right. And then I'm talking about the back-end stuff, okay? Right. Is it fair to say that that portion of the compensation that you hoped to realize, in a way, was going to be predicated upon market developments? Well, it was going to be predicated on market developments, among other factors, including John Stafford going over and working with PDO. Is it fair to say that if the market had taken off in a favorable direction vis-a-vis your position of your clients that we wouldn't be here today? I don't think that's fair to say. You don't think it's fair to say? No, I don't. You mean if you made a ton of money off of the back-end? You would still be going after Mr. Stafford for damaging him in your way. How would he have breached his fiduciary duty if the back-end payments turned out to be more than anybody could possibly imagine? Well, I suppose that you could say he breached his fiduciary duty as a matter of degree. Would they have been better had he performed his fiduciary duty than they were? This doesn't really have anything to do with— All you're doing is moving the ball. But this doesn't have anything to do with frustrated expectations about the potential— No, I know that that's the blame that's been set as the motivation for this suit. I'm not asking you. Then I'm saying that that has nothing to do with it. I don't think it has anything to do with it. Okay. It has to do with the trust they imposed in him to go in to negotiate the best payments. He concealed from them—there's no real dispute about it— he concealed from them the fact that he had already negotiated a somewhat gross, although somewhat fluid amount, and that it was up to him to set the payments for his own partner. Mr. Fox, one of the concerns we have is when we write our decision, how do we limit our decision in such a way so that every time an individual says, okay, you go ahead and take care of that, a fiduciary, in fact, relationship hasn't been created by virtue of our decision? Where is the fiduciary, in fact, element that you want us to focus on and say this is what turned this case, or this is why we could argue before a jury and say a fiduciary, in fact, whereas we can't write—we don't want it to be every time somebody puts their so-called trust in someone else that a fiduciary, in fact, relationship has been created. One of the things the courts haven't done to this day is to do that. So you think we could do that? This would be a case of first impression for us, wouldn't it, in Illinois, with respect to the parties? No, we don't want to call this a securities case. No, it's not a securities case. It's not a securities case, except that ultimately the contract that the parties entered into involved securities. And some of your ultimate compensation was dependent upon the performance of the securities. Isn't that correct? What this court can make clear is the following. Was there a sufficient— You didn't answer my question. I'm trying to, and maybe I'm going wild. It takes a yes or a no. That ultimately the amount of money that was to be enjoyed by your clients depends in part, in part, on the performance of the market. In part. Thank you. That's all I wanted to know. Okay. But the other part that would have been enjoyed by them was the amount that would have been negotiated by Stafford had he done his duty. All you have to say is where somebody makes a promise and where there's credible evidence to support that, to undertake a specific trust, where they ask for the exclusive informational conduit to accomplish that trust, so that you have no way of invading that informational conduit. You have no way of creating a check and balance. And one thing, point I want to make, sir, because I think it is— Hold on. Stop right there because, you know, every time that happens, are you talking about a fiduciary, in fact, relationship having been created so that there is far more obligations placed upon the parties, placed upon— Well, I'm not suggesting a fiduciary. In fact, that relationship has been conducted. But one of the things you have is a confusion here in the Illinois Rockford case is what I suggested. What Illinois Rockford suggests is if it mimics a partnership, it engrafts upon itself the duties of a partnership. It makes that kind of weird language. But one of the things I'm going to bring up, which I think is important to you, Your Honor, is this whole idea of lawyer involvement. Lawyer involvement is certainly a factor. But the only thing where lawyer involvement can be important is if lawyer involvement effectively negates the dependence that a servant party has placed on the dominant. Here, all of the king's lawyers and all of the king's legal aid— All of the people who signed the agreement had legal counsel at one time, but not meaningful legal counsel. You used the phrase meaningful legal counsel. Well, what does that mean? Is that disparaging the attorneys who work for you? Well, I don't know. They may have been disparaged by people other than I, but I'm not saying that. What I am saying— That means that ultimately— No, what I'm saying here is that— No, what I'm saying precisely— You're going to go through the lawyers? I'm saying precisely, I think. But then I begin to doubt. You see the problem, first of all. The reasons that you cite, for example, for fiduciary impact are so far removed from this particular case as to make them not very persuasive. What's your best case? You've got a single line. That's what I thought you were going to say. That was the 50-50 share with the one rascal out there exploiting the innocent partner. Now, that guy was a real rascal. We have to admit that. The evidentiary material in the record that he was a rascal was overwhelming, wasn't it? I don't see that evidentiary material being overwhelming in comparison to what we've presented here. I don't see what— That's not the problem I'm having here, is that you have suggested that it was his behavior that ultimately has damaged you. Yes. And yet I don't see any specific factual information in the record that says, were it not for what he did, we would have been in much better conditions. It's all speculative. Well, if what you're saying is that when somebody breaches the fiduciary— Breached. Now, how did he breach it? He breached it by lying about whether he was negotiating for them. He said, my duty is to negotiate for you, and then I read you his own statement saying I was negotiating for myself. Judge, if you're correct in that somebody can undertake that— You have to lie in order to breach a fiduciary duty. No, you don't have to lie, but this also involves fraudulent concealment. I know it does, and then we get into the other issue that you have presented. That's correct, but what I'm saying is this. It's one of those things where if somebody doesn't undertake that duty they have, and thereby destroys the potential to recoup that amount of money that would have been paid, how do you— There is evidence in all of the depositions about what the parties hoped to realize, but for the behavior of staff— Let me just try one more time in terms of why this is such an unusual case in many ways. Designated primary market makers, these businesses that were created were like default credit swaps. They were new entities in the market that were very, very difficult— I don't mean to call them default credit swaps. Well, I don't mean to say they were the equivalent of default credit swaps. I'm using that as an example. They were dealing with a highly sophisticated product. They were dealing with a sophisticated product that had been created in 1999 by a rule of the Securities Exchange Commission which said, we're going to allow certain market makers to control a certain percentage of the market. Which in turn made it very, very difficult, it would seem to me, even for sophisticated lawyers on both sides of this particular negotiation to figure out just about how much money they might make or how much money they might lose. That's right, and the only person who could figure that out was John Smith. Oh, now, wait a while. Was there any evidence in the record that he was clairvoyant? That he had a crystal ball? Did he make any promises about what these back-end payments would be? I think there were representations. I think we're going a little bit where I don't want to go. I know it's not where you want to go. I don't know. I'm saying I don't want to go there because with all due respect, the argument that I'm making is that John had a very unusual cache of knowledge. He had the knowledge of a metric that was not generally known among the public, and he had a knowledge of the metric that was used by Toronto Dominion Bank. In the midst of this transaction, when he lost, when he lost one of these entities, which, as you say, may not have been able to have a specific value on it, he coughed up $21 million back to D.D. saying, I lost this entity, I couldn't get this entity for you. I'm giving you $21 million back for that. This wasn't known to our guy. He was the guy with the thumb on the pulse of the valuation of designated primary market makers that were new creations and started in 1999. When something like that is newly created, even if it's been around for decades, it's not all that unusual when people enter into this kind of an agreement that they try to incorporate and, you know, excuse me for using what's become a pejorative, lawyered up. I didn't mean it in a pejorative sense. I meant it in a protective sense. You better be lawyered up if you're going to get involved in these kinds of negotiations. And the best thing you can do for both sides is to make sure, is to make sure that every possible contingency is reduced to writing. I think that, well, I think... And the only way you can get around these documents, it seems to me, is to trot out this fiduciary in fact. Trot. But it would seem that if you just read the documents, that all of the parties to the... All the people who signed... No. I don't. Staffers didn't sign. Okay. But that all of the parties who signed this agreement, which memorialized what they expected to get out of this whole transaction. In fact, forget about who negotiated. That what the lawyers were trying to do, who drafted the agreement, and don't tell me these agreements were drafted by laymen. I know better. Okay. I've read them. They were drafted by very skillful lawyers, and what they were trying to avoid was exactly what you brought to us here today. I can't agree with you on the last part because I don't know. I know they were drafted by skillful lawyers, and I know that lawyers to them... When the lawyers who were representing my clients, the ones who represented Big Blue, were asked whether or not they could get involved or somehow monitor or see whether John was negotiating in good faith with the other side, I said, how the hell would we know? We don't know anything about that particular area. We can't help you out. We cannot protect you. Okay. I understand your point. It's been very ably presented. Thank you. All right. Wait. I have a question. Number one, aren't you trying to say that Stafford should have made a full disclosure? Correct. Isn't that what you're trying to say? Absolutely. And second, what effect did the TD Options Agreement non-reliance clause have on that? The TD Options Agreement non-reliance clause? It did. The non-reliance clause had no effect on it because John Stafford, as the representative negotiator for them, who should have disclosed what he was doing, had no exposure to that clause. He was their representative. The reliance that was protected against was reliance against their adversary. They understood him to be their friend and their representative. Let me ask you this question. Sorry. Justice Gordon, is that working? Sure. I'm not sure whether this is your position, but you seem to be suggesting that if events occur during an interaction between two parties that give rise to a fiduciary, in fact, claim, whether or not, at least colorably, that documents prepared sometime later cannot color those events that have already occurred in a different way than they arose. That if they arose where a fiduciary relationship appears to have been created, then documents later on cannot vitiate, undermine, transform the relationship that existed at the time. They could if you knew the deceit that occurred. Well, no, but I'm saying that you can't wipe clean the slate. You can't wipe clean what already happened by virtue of these documents that appear to exonerate or appear to put everybody in equal position or appear to give everybody a due diligence sort of obligation. That's a softball for you. You're supposed to say that's true, Judge. If I'm supposed to say that's true, and that helps me, I'm trying to be very careful in terms of a broad premise that you have said. I think in this particular case, as I said, I framed it colorfully, if not cogently, as somebody once said to me, all the king's horses and all the king's men. But isn't this case really decided on those documents that were released, that were prepared during the course of the attorney or the lawyering up, so that it appears that Judge Preston said, you know, there is no fiduciary, in fact, relationship here because everybody was lawyered up. No, he said that people were lawyered up because he, much of this case was argued about the lawyering that was done over the veto power. He was totally, in fact, almost all the argument was directed at that. The final documents were to, as I've already said, the warranty, and I use a qualitative word, was a ruse in terms of protecting against, if Stafford had... It was a ruse? A ruse in this sense. You were the ones that asked for it. Pardon? You were the ones that asked for the warranty. No, we asked for the review of the Master Purchase Agreement. It was suggested in return that a warranty might be in replace for the Master Purchase Agreement. Which you purportedly accepted. Yeah, and I thought I explained before, and without being critical of the lawyer's address or whatever, but the warranty is correct. Whatever John chose to allocate, if he chose to allocate $0.10, he got $0.08 and they had $0.02. So what? It doesn't protect them. All right. We'll give you a few minutes later. Is there another side to this? I thought there were two appellants. You were splitting your time. Who do you represent? John Stafford. Oh, okay. There's an individual attorney who we have got sanctions against, and I believe he wanted to speak. But you haven't reached the sanctions issue yet. No, yeah. Argue that separately. The 137 issue. May I take a moment to get your order? Sure. Name, Mr. Miller? Yes. Good morning, Mr. Miller. Good morning. I'd like to start by addressing a few points that came out during the argument just now. You protected some? One has to do with the warranty claim. The warranty that JSS and GPZ gave, these are the Stafford-related entities, that Stafford and his family were not receiving disproportionate consideration. That warranty was in there, and I think I heard Mr. Fox saying that John Stafford had nothing to do with that because he wasn't a party to the agreement. GPZ and JSS, the Stafford entities, they were parties to that agreement, and they signed it, and they're the ones who gave the warranty. And I think the warranty is important for three reasons. One is it clearly shows they didn't trust Stafford because the way it came up, you asked how did it come up. The attorneys testified it came up because their clients came to them, the plaintiffs came to them and said, we think Stafford might have a side deal. We're worried about that. What can we do? And they tried to find out what is he getting, and then they got this warranty in return. So they didn't trust Stafford. He clearly didn't dominate and control them. If he did, that warranty would never be in the document. And the third point is they had a contractual remedy, and in fact, I think you alluded to, perhaps there's a misunderstanding that the warranty claim would be against Stafford. They had a warranty claim against the entities that warranted it, GPZ and JSS. They sued the successor in interest to GPZ and JSS, TD Options, in this case, for breach of that warranty. And they settled. Presumably they got consideration for that claim. So this is about trying to bring Stafford back in. So that's on the warranty count. On the, another point having to do with the, with Tarapelli, Mr. Fox said that Stafford wasn't covered by the nonreliance clause in the LLC agreement because he wasn't a signatory. He was a signatory to the LLC agreement, and it says, no party relied on any representation by any other member. Mr. Stafford was a member when deciding to purchase securities. And this all was a security transaction. Everything the plaintiffs got in the STA were securities. They got Class A units, which they then sold to the bank and got cash, and they got Class B units, which gave them a right to share in profits if the company was profitable, which it wasn't, but it gave them that right. Stafford got his consideration the same way. So was Stafford signed individually or? Individually. The LLC agreement, Stafford signed individually. Then there's the STA, which also has a nonreliance clause, and that clause says no party relied on any representation or warranty of another party. John? John Stafford didn't sign that individually. True. But it says no representation by a party or its employees, officers, or agents. All right. Stafford was the only owner of JSS. He was the only managing member. He was a co-CEO of GPZ. He clearly falls with it. They claim they thought he was GPZ. He was JSS. Clearly, he falls with the NAC clause, too. But you wouldn't even need to get there because you could just go with the LLC agreement where he wasn't a signatory individually. Mr. Fox said that Johnson did not have a lawyer. That is not true. Absolutely not true. Johnson hired Sacknoff and Weaver just like the Big Blue parties did. Sacknoff represented them. There were six attorneys. They billed hundreds of hours, $60,000. The attorneys testified. There were rigorous negotiations. There were heated discussions. Johnson did have an attorney just like the others. Let me ask you this question regarding what Mr. Fox quoted Mr. Stafford as saying. He said that he negotiated for himself only. But obviously he negotiated for the plaintiffs as well because it had to be a package deal or no deal. So how does that get factored into deciding whether or not there was a fiduciary in fact? And do we say that in this situation, that as a matter of law, no fiduciary in fact could have ever arisen? And are we in effect lowering the bar to allow, you know, maybe it's with regards to sophisticated parties. Maybe the bar should be very low. And it should require a great deal more showing than occurred here. Is there a question? Can I answer in two ways? The first way, I'd like to talk about some of the facts that I think are pertinent. The first point, I think you do consider that. I mean that's a factor you'd have to consider. But I think one thing you're asking is what was Mr. Stafford's role in all this? Well, the way the transaction was originally going to be structured, JSS and GPC were going to buy out the third-party intros and then they were going to transfer that over to TD Options. And the third-party intros are the plaintiffs? Yeah, exactly. And others. They're not the only people. And so there was a certain amount of money set aside and Stafford was going to be using that to buy them. It ended up getting structured differently. But while these negotiations are going on, Stafford's companies are the buyers. They're buying this. And that's how he understood it. That's how the Big Blue's partner, John Hayden, he was their lead negotiator. That's how he understood it. He testified it was very clearly an adverse relationship. He's got a plaintiff. He refused to join. And if you look at this, you're asking is this a fiduciary in fact relationship? It's clearly not. If you look at the facts on this, it's clearly not a fiduciary relationship. In fact, the plaintiff's attorneys themselves didn't see it that way. They didn't bring that claim. They originally said Stafford was TD's agent. That was probably closer to the truth than anything else. Then they came in and said he was our agent. That failed. And then they came, it was only years later that they didn't have any other place to go that they said he was our fiduciary. Even they didn't think it was a fiduciary in fact relationship. The original relationship between the plaintiffs and Stafford was predicated on a document. Was it not? There was a written joint venture agreement that was between, this is important, plaintiff's companies and Stafford's companies. Okay. Not individuals in other words. Stafford himself individually was in the Johnson Joint Venture for a time, but not at the time of the transaction. Now, with respect to his veto power over any subsequent sale, that was a negotiated document. Was it not? Stafford gave up 10% of the purchase price. I'm really not interested. It was negotiated. It was, yes. It wasn't something that you could say, well maybe you could, I don't know, although I don't recall him making this argument, that because he had this rather unusual veto power over any subsequent sale, that it gave him an extraordinary amount of power over how any sale might take place. A power, again, that he negotiated for and gave up a lot of money. Well, that was negotiated. It wasn't something that was born out of a fiduciary relationship. Exactly. That's right. But it's a rather unusual thing, rather somewhat unique to the particular agreement that these people had entered into, and as you say, in exchange for certain other things that he did give up. Well, I would submit it's not unusual. It was a contract. And it's not unusual at all in situations like this to say, when you sell substantially all the assets of a company after you have unanimous consent, for example. So I guess what I'm saying is, why isn't this done? Ultimately, I heard nothing more than a breach of contract. Perhaps it could have been a breach of contract. They didn't bring that claim. I take it back. They did bring the claim. They brought a breach of the warranty, hence the party who gave the warranty. Right. And they sued on it, and they got a settlement. Okay. But I'd like to focus on some of the facts, because you have to look at, I think they're correct, you have to look at the entire factual circumstance. And when you do that, I think you see there can't, trust alone is not enough. You correctly noted that. If you look at BABRA, if you look at state security, in both those cases, the plaintiff trusted the defendants to negotiate for them. And the court said, that's not enough. You've got to look at things like kind of intelligence, family relationship, things like that. So click through the factors. There's no family relationship. The plaintiff's highly intelligent. They're seasoned floor traders. These guys were the ones running the business. Not Stafford. They're the majority owners. They tried, he said Stafford knew the market. They were out, the record's uncontradicted, they were out marketing the businesses. They were out soliciting offers. Stafford wasn't doing that. They knew the value. And then they exercised independent judgment. And I'm holding the facts relating to sanctions. They exercised independent judgment in connection with the transaction. The big blue plaintiffs came in. Stafford made a proposal. They said it's grossly inadequate. They demanded more. They ultimately negotiated $4.5 million more for themselves. They exercised independent judgment. They flew out to New York and met with the representatives of TD during the negotiations. John Hayden flew to Canada and met with Jason Marks where they talked about price. And Mr. Marks said, I'm not accepting your price. It's too high. A very important fact we've already talked about. They're represented by independent attorneys. After their attorneys were involved, when they're negotiating the terms of the document, they negotiated a million-dollar increase in the back end portion of their compensation. And then you go to the contracts themselves, which we've already talked about. They represented their sophisticated investors capable of assessing the transaction for themselves. They four times represented they didn't rely. They represented in writing they didn't rely on anything orally. I think just stop there. And I have a lot more to go into. If you just stop there, no reasonable trier of facts could possibly find a fiduciary in fact relationship. And here the trier of facts is the circuit court itself. It's not a jury. The circuit court would have been proper to enter summary judgment just on those facts alone. All right. Just so it's clear, between the three counts, or really two counts, so one count having two subparts, was it? Fraud and... There was fraud, fraudulent representation, fraudulent concealment. The fraud, I mean the fiduciary in fact claim is the principle one that we're objected to a clear and convincing evidence standard. Standard as well. Right. Yeah. Let me read the standard. And what's the policy behind demanding such a clear showing of a fiduciary in fact relationship? There must be something that says, why do you have to demonstrate it in such clear, and it's pretty easy to allege it. Maybe that's it. And that's why I was asking. Was it thoughtful? Exactly. It's very... Well, and also it imposes very strict obligations. It imposes very strict obligations on the fiduciary. Full disclosure, loyalty, can't do certain transactions. Before that, those sorts of obligations are foisted on somebody. Either have to understand, I'm getting into this relationship. I know it. I'm an agent. I'm an attorney. Or it has to be such an extreme circumstance. And the standard is, it's not just clear and convincing. It's, quote, proof the existence of the fiduciary relationship. You have to prove the existence of the fiduciary relationship by proof so clear, convincing, strong, unequivocal, and unmistakable as to lead to but one conclusion. That's the standard. And based on that standard alone, would you say, and here's a softball question, would you say that an individual that believes, or plaintiff believes, are in a fiduciary in fact relationship would know that from the start? They might know that. Would know that from complaint number one as opposed to complaint number four? They might know that instead of alleging that Stafford was actually asking a TD's agent at the time when they're trying to hold TD liable for Stafford's conduct because they hadn't settled yet. I would think they would know that. And then as far as the proof, you look at the trust element. The cases are really clear on you have to trust and dominance. If you think about it, if there was just trust alone, then anybody could come in with an affidavit, we trusted this other person. Well, there's a certain amount of dominance involved, too, based on the veto provisions in their original agreement. Yeah, but that's not the dominance. Well, pretty dominant when no matter what kind of a deal you're going to fashion on your own, assuming that you fashion the deal on your own, Stafford could veto it. But that's the dominance that was negotiated for and agreed upon between the parties. Right, exactly. But if it's just trust, I trusted this guy so much, you come in with an affidavit, you can never get rid of a case on a motion to dismiss. You can never get rid of a case on a motion for summary judgment. Every transaction you bear the risk of, not just litigation, but of a trial. It's just somebody coming in there and alleging. Well, that's not necessarily a bad thing. I mean, that's what trials are all about, to tease out the truth. It's bad if you're the person who paid $3.8 million just to get through summary judgment. And that's a good segue to your next point. Yes, Your Honor. Should I turn to that now? Your Honor, I went through the facts that I think support the motion for summary judgment and clearly make it appropriate to answer it. Well, I think the fact that a summary judgment motion was filed suggests that this isn't a situation where, you know, a sanction where it was so clear that they had no basis to file the action at all. And in particular, Judge Preston's remarks that there could be a good basis to overrule prior case law or extend case law or the facts here are maybe bordering on that. Maybe they don't cross the line, but there's certainly enough here to say that, you know, we're not going to treat this as if this was a frivolous lawsuit. And that's what Judge Preston said. Let me address first what Judge Preston said. The only reasoning the court gave was to highlight the section of the rule that says you can make a good faith argument for the extension of the law. You know, when you say it's the only reasoning, it sort of demeans the effort and time and knowledge that he had of this case. Well, I think what – I don't mean to demean Judge Preston. I really don't. And he was certainly very familiar with his case. Very familiar with the case. But I think – I would submit the real reason was he didn't want to impose a financial obligation on the plaintiffs and their attorneys. That's the real reason. I can't say that, and I don't know that that is, but I submit that probably is because the reason he gave doesn't make any sense. At the same time, you'd have to say that you allow for amended complaints to be filed because you want the plaintiff to win or you want the plaintiff to get something back or something like that. But he allowed for amended complaints because he felt that there was something that might support a cause of action. I don't know if that was his reason for allowing them or not, but I will say – Well, we know that that's the law. I mean, that's the standard that he would apply. It's very liberal. I think most judges are very liberal in the law. And do you have to overcome that showing to succeed on your Rule 137? No, but 137 – many 137 cases are decided after trial. The point is they came up with enough stuff to allow the case to go forward and go forward and go forward. But it was lies. How many 137 cases have there been where the appellate court overrules the discretion of the trial court in ruling on that 137? I cited in our brief, I think, 10. There may be more. And one of the – What's the case that you rely on the most? Can I answer that in just a minute? Sure. One of the reasons why I think it is important to focus on what the judge did is there's a deferential standard of review, provided that the court gave reasons. If the court didn't give reasons for its ruling, it's been outlawed in this court. Well, the court here did give a reason. It said, I highlight this section of the rule. But then you have to go to the cases which we cite, which say – And allow 137 cases. If the reason given by the court has no basis in the record, then you should reverse it. This one has no basis in the record. They never argued for an extension or modification of the law. They're still not arguing for that. Oh, I don't know about that. I mean, gosh, we haven't got that many cases out there on fiduciary and fact in commercial context. One of them, really. We've got the rascal in the Supreme Court case. No, there's – The Roberts case is not even close to being applicable here. I agree. But that doesn't mean that somebody can't, through imaginative lawyering, argue that the fiduciary and fact ought to be extended particularly to a set of facts such as this, where there doesn't appear to be, on the face, because of the way the contracts were drafted, any equitable relief for the plaintiffs. They're basically arguing for equitable relief. Your Honor, some of the cases are – Just give me your page. Page 19 of the opening brief. Yeah. Okay. Let me get in for just a minute about some of the facts, why I think this is egregious. Look at the timeline for a minute. They say, when Stafford elicited the trust, it was in a meeting sometime in August or September. They testified differently about it. At exactly the same time, August 24th, they hired Sacknoff and Weaver. The matter they hired him on, dispute with joint venture partner. After talking with the clients, the attorney said, who's the adverse party? Stafford. John Stafford, an adverse party. And then they started talking with their attorneys about a lawsuit against Stafford. Here's a document, one of the documents. I know. You relied very heavily on the documents. They resisted turning over to the trial judge. Yeah. And the trial judge understood. The trial judge saw all those documents. He did. Absolutely. And I get the view on 137, you're suggesting somehow ought to be morphed into a De Novo review because he didn't explain his reasoning more effectively? Well, I am suggesting that. And there's first district case law in support of it. It's Bank of Homeward versus Chapman, which says exactly that. But that's when the trial judge didn't really say anything at all. When the trial judge did not give his reasons. And then there's other cases that say if the trial judge does give a reason and it's manifestly not the case, then you reverse on that. But we've got a record here. Even on a De Novo review, we have a record here to traverse. And I suppose we can even take into consideration Mr. Fox's brilliant oral argument. You think? Yeah, absolutely. Your Honor, you're right. I have quoted this. This is a document that their attorneys thought they should have had access to before they filed it. They're saying Stafford will sue BBT at any cost to create problems. This is in the middle of the trust, supposedly. They say immediately start a game plan with Boeing. Do you think that would be enough to break any kind of fiduciary trust relationship? It's enough. Play hardball. It says BBT will not be forced. Playing hardball is something that lawyers in Cook County and the city of Chicago, they've been using that phrase since I was in law school. BBT will not be forced in this deal. We will go to battle as pointed. We'll go on the offensive as necessary. Stafford has a lot more to lose than we do. No attorney reviewing this document could possibly conclude that there's a close and trusting personal relationship. Well, it was just being breached. That's why they're angry. I mean, there's good sides to both of these arguments. That's why 137 is very difficult to sustain just because the wiring gets very aggressive. There's one thing to being a zealous advocate. But 137, the cases are clear, imposing a duty on the lawyers to also to their opponents and to the judicial system. You've got to not just look after your own interests, not just focus on zealous advocacy. And you can't go into court after saying we controlled him. That's why he was our agent. We controlled him. Mr. Gold, I can quote from him, he said, The plaintiff's record is absolutely clear that the plaintiff's controlled Stafford when they were arguing agency. So that claim failed. He comes around. Stafford dominated and controlled us in the face of these documents. But this is not, I said, with all the other facts, don't even consider this stuff. Sure, we can do the judgment. But this goes so much farther. It goes so much farther. They try to get Stafford to join as a plaintiff. He refuses and then they sue him. Flip-flopping theories. Trying to hide the documents. You'll get a few minutes to rebut whatever arguments there are regarding the 137 motion. Although counsel has a right to rebut the argument you've made. We have to give him another two bites at the apple, actually. Thank you, Mr. Miller. So now it's Mr. Fox, add to your original appeal, rebutting the argument that he made to challenge your position, if you'd like to. The gentleman sitting next to you, is he going to say anything? Yes, he does the word 137. But now you can address both matters. You get a rebuttal argument and then you get 137 response. So what do we do with the adversarial nature of the relationship that arose at some point? Maybe not initially. But it certainly seems clear that there was adversarial undertones in the interactions between the defendant and the plaintiff. You know, an odd aspect of fiduciary, as a matter of fact, is it's a child of fiduciary as a matter of law. And it was difficult in this case always to separate the two because you could argue that as a joint venture partner, these are contracts, these are joint venture partnership agreements that Johnson had with him. He was his joint venture partner as a matter of law, which would have given him alone the utmost duty of honesty, the utmost duty of forthrightness, and the utmost duty of fair dealing and good faith toward his partner Johnson. He has not denied that he was Johnson's partner. He just said, I shipped it off into another entity, which you can call a mechanism. And then, therefore, did it become no longer a fiduciary as a matter of law and a fiduciary as a matter of fact. That's a perplexity. And so what happens here is that he mixes the time sequence when all this happens. You would think from the argument that you just heard that they accepted the fiduciary that he committed to go and negotiate for them, walked out of the door, crossed the street, and into the lawyer's office and said, now we think John is a scoundrel and he's out to get us. That simply isn't logical, it's not meaningful, and it's not helpful. All I can say is this. There is a case, by the way, that was cited by, and I'll get it here, Matt Gray, because it was cited by the defense. And this is another one of those ones that Your Honor may have referred to. I mean, these cases are messy. These fiduciaries, as a matter of fact, cases and law cases are messy. But on page 442 it says, however, it is definite that these parties were partners in operation of the motel. Despite use of the name of defendant's son in the transaction, the litigants agree that the actual parties in interest were plaintiffs and defendants together. And then it says, because they were the actual parties in the interest, we impose upon them, and it necessarily follows that they each owe the other the duty to exercise the highest degree of honesty and good faith. Tell the name of the case again. This is Vabre. And it is on page 442, and I will give you the site. It's Vabre v. Carlino, C-A-R-L-I-N-O. And it is cited as 2nd Illinois Act, 3rd, 241, 276 Northeast 2nd, 435. This situation that we had sheaves so closely to both the law and the fact situation. It's ridiculous to argue that we were trucked. What we're trying to find out was exactly who the agent was, John. Basically, you're arguing in the context of fiduciary and fact, it's very, very close to a developing area of the law called good faith and fair deal. Right. Which for years was kind of ignored, and now is starting to gain a certain cachet in certain courts. In every contractual arrangement, there has to be an underlying element of good faith and fair deal. That's true. And when he comes in and he argues that they had that, I'm forgetting the argument he made, but he was arguing that Stafford, or that these people sued. At one point, there was a complaint early on when this case initially started, when the facts were being investigated, that suggested that Stafford was perhaps Feedy's agent, and that therefore that's somehow an example of some sort of horrible disingenuousness. No, it isn't. We didn't know. We knew something was wrong. We knew that what Stafford had promised to do hadn't been done. We knew the money he had promised to get hadn't been gotten. We didn't know who he was acting for until that point in the deposition when he said, By the way, guys, I had a pile of money, and if I gave you 80 cents for your 80 percent share of Big Blue, I got to keep a dollar. Then I could give GSS 20 cents. But if I gave a dollar to you, then you split it between each other. And that was really the perfidy, at least as we've alleged it here. I don't think you used the word perfidy, though, did you? Did I use perfidy wrong? Not at all. I don't recall seeing it in your brief. You know, I thought I might not, I might should not use it here. But it was a betrayal of trust. And here I will only argue very briefly about the sanctions motion. Once again, he reads the sanctions as I read it. Well, the sanctions in your substantive issues that are followed, they follow each other. I just wanted to correct one thing, because it is always disturbing, my learned opponent, when he says things with great certitude that are not quite true. The court finds that Plaintiff's claim could arguably have been well-grounded and warranted by existing law. Or by an extension of law. He just got up and told you that the only thing the judge said is that we were arguing, that we were in court arguing an extension of existing law. Well, that is what the judge said. And that sometimes bothers me, particularly when I'm at the business end of a $3.6 million sanction motion. Thank you. And then now, counsel, if you'd like to address us briefly. And really, this issue goes to, if we were to deny the appellant any relief, then we would go to the 137 motion. And you believe we should deny that to the cross-appellants as well. May it please the court, my name is Ed Durham, and I am one of the appellees in the sanctions appeal. I was also one of the attorneys representing the plaintiffs at the trial court. I became involved in this case in June of 2008. Were you involved in all the amended complaints? No, I was in 2008. You came in rather late. I got involved four years after the original complaint was filed, and about a year and a quarter after all the motions were dismissed, pleading practice had occurred. Had the fourth amended complaint already filed? It was already filed. The court had already ruled that the motion dismissed was going forward. But I got in a case where we were going forward to trial, and I was basically signed on to be an assistant to the Fox and Fox firm in the briefing discovery, and if there was going to be a trial. I'm also lead counsel against John Stafford in a case in federal court. I know that you managed to wedge that or shoehorn that particular litigation in, but I don't understand. I think it's relevant because why are you suing? I don't know. Before you even go into it, was it ever brought up before the trial, sir? Yes, it was. Oh, it was? So he actually listened to an argument you made with respect to federal litigation? Yes. As being probative of what you were attempting? It was part of my affidavit that I submitted to the court. So it was before the trial, sir? Right. And the reason I say that is I stand corrected. I only had about an hour and a half slideshow that I showed the trial court, which gave timelines and showed that there was a lot of false representation made by counsel. For example, one of the arguments was that at trial court, there should be sanctions issues. A slideshow? A slideshow, excuse me. One of the arguments was that we should have, and I personally should have, sought to dismiss the case after I became involved because, in fact, the plaintiff's counsel, by denying it or request for admission, that they had negotiated the price, that that was false and that I should be sanctioned for that. Well, you don't really hear that argument here on the appeal, and the reason is that as we brought forth at that time, in its deposition, that lawyer was asked who negotiated the business terms if you were separating those out. I don't know, but I do know that I did not negotiate the purchase price. Was the back end part of the purchase price? Yes. That was Bill Durand, the lead transactional attorney, who, by the way, got involved in the case about a week before closing, and there's been a lot of talk about lawyering and it's important for the sanctions issue because when I got involved in the case, one of the first things I was asked to do was to brief the issue as to whether the documents of Reed Smith should be turned over, and Mr. Miller argued to you from one of the notes from that document. What he doesn't tell you is that the attorneys, David Bohan, when he was questioned, he doesn't agree with his interpretation of those notes. He was asked repeatedly, for example, even though those notes show that John Stafford, these guys were negotiating against John Stafford and that they should have known it, but yet when Mr. Bohan was asked those types of questions in his deposition, basically they asked him to agree with his understanding that his clients were concerned about getting the best possible price from John Stafford. He said, right, I agree that, I don't read this to say that John is a potential buyer, and then he goes on to say that it was his understanding that John was negotiating a purchase price with TV, which is what the plaintiff's understanding was. And then they go on and say, weren't they going to tell John that his price wasn't in the ballpark? I think they wanted to make sure that John negotiated the best possible price for the DPMs in his interaction with TV. So rather than agree, this is a lawyer, this is the guy who actually spent the hours, and there's another distinction. Counsel got up and argued as if that document applied to all five plaintiffs. It only applied to three of the plaintiffs. Two of the plaintiffs, Johnson and Hogan, who were at the trial court, agreed on price terms in September of 2007. They did not retain counsel until about a week prior to the closing of the deal. And at that time, their lawyer, Bill Duran, again, writes an email to the TV folks about the closing, and he says, he writes on December 17th, the deal closes on December 21st. I'm expecting a call from Tom this afternoon, and I hope for the first time to hear the specific breakdown for each DPM deal. Total dollars, earn out allocation. In other words, what you have to focus on is what our allegation was. Our allegation was that John Stafford was a fiduciary for negotiation of a purchase price with TD Bank. And I don't think there's a piece of evidence that shows that any attorney was involved in that negotiation. And that was the basis on which we went forward. That was the basis on which I argued to the trial court that those documents weren't relevant. There was a privileged objection that had been raised, and they had basically come back and said, well, Judge, it's not relevant. Or they said it's relevant because it shows the distrust between the parties. I felt so strongly that the fiduciary breach law should extend to the situation. I asked the court to file a supplemental brief, and it's attached to my brief, where we argued that. We didn't hide anything from the court. We told the court. The representation related to closing the transaction, and the representation related to this veto issue, as to the victim complaint. And based upon the case law, we believe that because our allegation was that the fiduciary duty that was alleged was only for negotiation of a purchase price with TD Bank, and not about all the other issues that counsels argued was the scope of the fiduciary duty, that it was not relevant. The court rejected that. One of the arguments that's been made is that I should be sanctioned for 3.6 by arguing that those documents were not relevant. Didn't hide it from the court. Argued why we didn't think they should be produced. We produced them to the court, and the court made a decision. Additionally, they asked that I be sanctioned for arguing in some judgment motion that there was evidence of dominance. The dominance that was argued, which is unlike what they're arguing, and I think the court is making a distinction, is the dominance was over the communications over the purchase price. And I don't think there's any doubt that he dominated that. He said, let me negotiate with TD. Let me do the conduit through which discussions occur. And they said, okay, John, go ahead and do that. He said, I believe it's best that I can get the best possible price. We know that's not true. That's not what he was doing. He then came back to them and said, here's a price that TD is willing to pay. And each of the plaintiffs testified that their primary concern was, John, is this the best you believe that TD was willing to give? And in each case, he said, yes. It was important to him that it was a price that TD was paying and it was the best he believed they would pay. In fact, we know that that never occurred because he was negotiating with TD. He basically said, excuse me. All right, you'll have to wrap it up. He was negotiating out of his own back pocket. So the dominance that we were arguing was not dominance over the decision to say yes or no to the deal. It was only dominance as to those communications over purchase price. And to that extent, maybe that's what the judge was referring to was an extension of the law in fiduciary, in fact, cases. Correct. To avoid a sanctionable. And I think at the trial court level, the argument was made that we were basically arguing a sliver of impressment. I actually believe that the case law doesn't support that. The existing case law supports that. And then I think that if you look at the arguments that are made on sanctions, essentially they come down to they ignore what is alleged. You have to look at what we're alleging. You may not agree that that fits within or that doesn't constitute a breach of a fiduciary duty, but you have to look at what we allege. And what we allege was that he was fiduciary only for negotiation of a purchase price. And then you have to look at the interpretation of the existing evidence. A good example, again, is this document that they're relying on. The attorneys were questioned about their involvement with the negotiation of purchase price. They denied it. The attorneys were asked or they tried to get the attorneys to say that they understood that Stafford was the adverse party. They wouldn't agree with that. And so when you look at that, and then also they look at the case law, they take basically the same Supreme Court cases which say that basically there is no restriction on relationships. There is no restriction on the facts that can be alleged for fiduciary as a matter of fact. And they look at the facts and say, well, this case is unlike the facts of those cases. So you then should hold that as a sanctionable event. I just think that's a far field from the standard for sanctions. All right. We understand your position. Thank you. Thank you. Mr. Miller, a quick question. Why is counsel present in the case? Unless you're indicating that the sanctions really only begin to run in 2008 or did we just happen to get caught up in those? We're addressing that point first. We're not seeking sanctions from Mr. Durham for anything that occurred beforehand. The case law is, you can see this in a lot of cases. So let me ask you this. Yes. Does Mr. Durham then have to review everything that happened before he gets into a case? Because if he gets into a case, he subjects himself to sanctions for what he's going to do thereafter because of something that occurred before he got into the case? No. This is the rule. Baker versus Berger is one articulation of it. An attorney has a continuing professional duty to promptly dismiss a lawsuit once it becomes evident that it's baseless. Or there's another case that says when an attorney discovers discrepancies or inconsistencies with a pleading, he has an obligation to forthrightly bring it to the attention of the court. And they say that forthrightly means at least by the time of the next court filing. That's Chicago title. So when an attorney is going through the documents, Mr. Let me ask you this. So if Judge Preston said that that obligation there was not triggered, do we defer to that determination by Judge Preston? I think the standard of review, if you find the court provided reasoning, is. No, but your motion is based on that obligation that wasn't fulfilled. That's correct. But Judge Preston didn't say that that obligation ever was imposed on him. He did not state that in his reasoning. His reasoning was not that. But certainly the motion itself was extensively litigated? Yeah, and we brought this point up. We definitely raised the point. Discrepancies and inconsistencies. It was Mr. Durham who was responsible for fighting the Sacknoff and Weaver documents. He's the attorney who reviewed the documents, prepared the papers. Can you imagine yourself being in that position? Do you think you would have taken a contrary position trying to protect documents as attorney-client privilege or work product documents? They did assert work product. I know they did. They absolutely did. And don't you think that's what lawyers do? What did you say? That is completely inconsistent. They said these documents are work product because we had a continuing fight with Stafford all the way from the time that they were- Oh, you mean it's inconsistent with their position that he was a fiduciary? He was their trust and capital. That doesn't take away from the possibility that they could still be characterized as work product. Well, they definitely could be work product. In fact, I think they definitely are. Well, they were, and the court said you waived it by bringing this claim because it brings into question- That's another issue we haven't really addressed. The waiver sounds kind of, well, never mind. That was not appealed. It's not an issue. It's not an issue. But when you see those documents and actually conclude and represent to the court, that's because we were in potential litigation with Stafford at this time. And you see the documents that I highlighted earlier in the briefs. Yes, you do have an obligation, and I would have brought it up. I absolutely would have brought it up. I wouldn't allow a client to continue. But can I address one other point? Sure. Mr. Durham said there's no evidence in the record that plaintiff's attorneys were involved in pricing. I would urge you to read AST 0547. AST 0547? 0547. This is an email that plaintiff's attorneys prepared to them, a script of what they should say when they're talking- Oh, this is the script email. This is the script email. And this is what they're telling them to say. They're saying, we've looked hard at your proposed offer. We just don't think your offer's in the ballpark based on pricing criteria. And they give them the pricing criteria. We think substantially higher prices are available. They say, if you, you, Stafford, or TD, can't or don't want to pay the market price, we'll be happy to run the company. They're giving them, clearly, getting advice on price. Now, I agree with them. The attorneys, when they testified, they said, well, we weren't negotiating price. But that's not the point. The point we're making is, they were advising the plaintiffs secretly behind the scenes about price, the very issue they say they trusted Stafford on. All right. Well, thank you very much. Thank you, Your Honor. The case is well argued, and the case will be taken under advisory support and recess.